UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SISTER KATE REID and MEGAN HEENEY as Next Friends of A.O.A., et al., K.G.C., et al., Y.V.R.V., et al., D.D.A.S., S.A.H., M.E.M., et al., W.Q.M., et al., J.P.I., R.H.P., et al., M.H., et al., and A.C.C.D., et al., | ) ) ) ) ) ) | Case Nos. 4:11-CV-00044CDP 4:11-CV-00045CDP 4:11-CV-00046CDP 4:11-CV-00047CDP 4:11-CV-00048CDP 4:11-CV-00049CDP |
| Plaintiffs, | ) ) | 4:11-CV-00050CDP 4:11-CV-00052CDP |
| v. | ) ) | 4:11-CV-00055CDP 4:11-CV-00056CDP |
| DOE RUN RESOURCES CORPORATION, et al., | ) ) ) | 4:11-CV-00059CDP |
| Defendants. | ) | JURY TRIAL DEMANDED |

**<u>AFFIDAVIT OF KRISTINE KRAFT</u>**

I, Kristine K. Kraft, am one of the counsel of record for the Plaintiffs and am competent to give this affidavit and state as follows:

1. I am one of the attorneys representing the children herein and have been doing so since October, 2007.

2. As this Court may remember, I applied for and this Court granted a Temporary Restraining Order on December 4, 2007, to prevent Defendants and their operatives from threatening and intimidating my clients. The TRO was extended, pending further order of the Court, on December 5, 2007. The restraining order was again ordered as remaining in effect, unless otherwise ordered by the state court, following the remand of the case on March 18, 2008. The state court did not terminate the restraining order, however, that case has been voluntarily dismissed. A new restraining order is necessary to protect our clients and staff in La Oroya due to the recent renewed threats they have experienced.

3. On November 15, 2010, I traveled to La Oroya, Peru with a group of other attorneys who also represent children who have been affected by toxic exposures from Defendants' lead smelter in La Oroya.

4. The purpose of the trip to La Oroya was to, among other things, meet personally with our clients about the pending litigation. We planned to provide our clients with additional consultation and assistance, and to make ourselves available to meet with any other families who were seeking information about the litigation.

5. However, our plans were altered after we arrived in Peru due to public announcements that Doe Run operatives and others intended to arrange an organized demonstration against us during our visit to La Oroya. As a result, due to the history of prior intimidation and serious threats, including physical threats, that have occurred against our clients and staff in Peru by Defendants and their operatives, we arranged for a police escort into the town of La Oroya, where we intended to visit with our clients. A team of 45 police officers, dressed in full riot gear, armed with assault rifles and protected by body length shields and helmets, accompanied us into town. See photograph, Exhibit 1, attached hereto.

6. The trip into town was done with caution as members of our vehicle carefully looked in all directions for signs of a possible attack or blockage in the road. When we arrived in La Oroya to meet with our clients, there was a large group of protesters blocking the entrance to the place where we were to meet. See photographs, Exhibit 2, attached hereto. I understood that the protest had been organized by the Defendants and their operatives. Some members of the crowd were waving their arms toward us and others were holding signs and shaking their signs towards us. The protesters were chanting loudly and angrily at us. Many of them were screaming at us. As we walked into the building to meet with our clients, some of

these people moved toward us as they yelled in anger. See video, Exhibit 3, attached hereto. Someone from that crowd pretended to throw something at the attorney walking in front of me and as a result, he ducked down. We were watchful of anyone who might throw objects, as we were aware that St. Louis University researchers and others had rocks thrown at them when they visited La Oroya.

7. As we entered the building, many of these angry protesters attempted to follow us. The police prevented them from following us. However, when we entered the building, it was apparent that other protesters were inside the building and that the majority of people there were protesters, shouting in angry tones, instead of our clients as we expected. There is no doubt that the protesters took over the area and their intimidation tactics disrupted the purpose of the meeting. See video, Exhibit 4, attached hereto.

8. Soon after we entered the building, Archbishop Pedro Baretto arrived. The Archbishop has spoken out in favor of the health of the children and in support of this litigation in the United States. The members of the crowd screamed at him as well and walked alongside him in an intimidating manner. I was amazed at the disrespect that they showed toward him.

9. One Peruvian attorney attempted to calm the crowd so that the presentations by us could begin. It took at least a half hour before the crowd finally quieted down to allow us to speak. During this time, despite the fact that armed police officers were present, the crowd continued to shout and yell and shake their arms and hands toward us. The crowd insisted that the other protesters on the street be allowed to enter the auditorium. Finally, the consensus among us was to allow them to enter, provided they allowed us to talk. The other protesters then entered the building and finally we began to speak after the Archbishop introduced us. The Peruvian attorney who communicated with the crowd was actually sweating by the time he was

able to finally calm them down. The entire situation was like nothing I had ever experienced before and was frightening and intimidating.

10. As I gave my presentation, I was constantly looking around the room, in anticipation of someone from the crowd throwing something or using a weapon. It was terrifying.

11. At some point, the Archbishop started to leave the building. As he tried to exit the building, a group from the crowd followed him and surrounded him. See video, Exhibit 5, attached hereto. Other people who were with the Archbishop quickly surrounded him to protect him. That same group hovered around the Archbishop during the time he exited the building. The Archbishop later told me that he had been severely kicked as he entered the building, and when he was trying to leave the area, a group of protesters ran towards his vehicle and were hitting the windows as he left. The Archbishop said that he had recently experienced heart problems and the uproar of the crowd upset him; he was starting to feel ill.

12. After the presentations were completed, there were periodic uproars in the crowd as we answered questions. Finally, we decided to leave and were forced to exit through the rear of the building, which was not originally planned. Members of the police escorted us out through a small stairwell and into vehicles parked in the rear of the auditorium. We were taken to the police station because it was considered unsafe to travel on the roads at that time. We were brought to the rear of the police station and sat in the chief's office. Shortly thereafter, the protesters followed us to the police station and were chanting outside. Given the fact that the station did not have very thick walls, it felt as if the group of protestors could easily break into the station. We stayed there about an hour before it was safe to leave.

13. As a result of the turmoil and threatening conduct that we experienced, the goals

of our entire trip were disrupted and required that they be changed. What was intended to be a group meeting with our clients was instead viewed by the public as a news conference, due to the public announcements that Doe Run operatives and others intended to arrange an organized demonstration against us. Furthermore, due to safety reasons, it was recommended by the police, and also obvious, that we not return to La Oroya during the next two days (which would have been without police protection) to meet with our clients. It was terribly disappointing that we were unable to do this, given the expectations of our clients and the time and expense that we incurred.

14. I later learned that a group of researchers associated with investigating the pollution of the Mantaro River, which necessarily includes deposits attributable to Doe Run, were at the meeting. These individuals later advised me that after the police left the meeting area, some of the protesters threw rocks at them. Although some of them were able to get out of town that day, others were unable to and they advised me that they were forced to stay in LaOroya over night with police protection. They then left the next day.

15. In addition, I also later learned that in December, 2010 the Archbishop received an anonymous phone call threatening him that he would not live to see the end of the year, or words to that effect.

_____
Kristine K. Kraft

SUBSCRIBED AND SWORN to before me, a Notary Public, this 10th day of January 2011.

_____
Notary Public

My Commission Expires: 1-2-12

" NOTARY SEAL "
Patricia J. Rinck, Notary Public
St. Louis County, State of Missouri
My Commission Expires 1/2/2012
Commission Number 08476039